2020 IL App (2d) 170233-U
No. 2-17-0233
Order filed October 14, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 99-CF-2071 |
| AVERY L. BINION, | ) ) ) | Honorable William J. Parkhurst, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in its first-stage dismissal of defendant's fourth successive postconviction petition because defendant failed to establish cause and prejudice or actual innocence.

¶ 2    Following a jury trial, defendant, Avery L. Binion, was convicted, based on accountability, of three counts of first-degree murder (720 ILCS 5/9–1(a)(2) (West 1998)), one count of attempted first-degree murder (720 ILCS 5/8–4(a), 9–1(a)(2) (West 1998)), and one count of aggravated battery with a firearm (720 ILCS 5/12–4.2(a)(1) (West 1998)). At issue in this appeal is whether

the trial court properly denied defendant's motion for leave to file his fourth successive postconviction petition. Accordingly, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      This case arose from the August 1999 shooting deaths of Anthony Cooper, Taiwan Jackson, and Tremayne Thomas, as well as the attempted murder of Corey Boey. According to the State's witnesses, defendant was the Elgin gang leader of the Black Disciples (BDs), who ordered several members of his gang to confront the victims over a dispute involving the theft of a safe, resulting in the shootings.

¶ 5                                   A. First Trial

¶ 6      Defendant's first trial began on May 20, 2002, and continued through May 29, 2002. After the jury reported that it was deadlocked, the trial court declared a mistrial.

¶ 7                                   B. Second Trial

¶ 8      During defendant's second trial, the State called Willie Fullilove to testify about the events leading up to the shooting. Fullilove, who admitted to testifying as part of an agreement with the State, specified that he was 15 years old at the time of the shootings and lived at the Elgin apartment building (Schoolhouse Apartments) where the shootings took place. Prior to moving to the Schoolhouse Apartments, Fullilove lived in the southside of Chicago, where he first became acquainted with the BDs. Once Fullilove moved to Elgin, he met local BD members, including defendant. While Fullilove said that defendant did "[n]ot particularly" have a title in the gang, he acknowledged that "everyone in town called him Chief." However, Fullilove acknowledged previously telling detectives that defendant served as the BDs' "minister."

¶ 9      Fullilove testified that he sold drugs from his residence, Apartment 12. He also testified that the residents of Apartment 23 sold drugs from their apartment and maintained a safe in

Apartment 28. On Saturday, August 14, 1999, Fullilove stole their safe. Fullilove then had the safe driven to the westside of Elgin, where he and others broke the safe open to find "[a] few pistols" and "little drugs," specifically cocaine. Fullilove testified that he left the pistols in the westside of Elgin and stashed the cocaine a few blocks from the Schoolhouse Apartments.

¶ 10    Upon returning to the Schoolhouse Apartments that Saturday night, Charles Keys, one of the inhabitants of Apartment 23, confronted Fullilove about the missing safe. Although Fullilove denied taking the safe, Keys confronted him once again the following Sunday morning in the Schoolhouse Apartment's parking lot. Fullilove said that after he once again denied taking the safe, Keys took "a swing at [him]."

¶ 11    Later in the day, Fullilove shared two phone calls with defendant to discuss the safe dispute. Although Fullilove claimed to have told defendant that the dispute had been resolved, he admitted that defendant told him "a few would be coming by [defendant's] house the next morning to discuss the safe issue and other issues." Fullilove specified that he understood that the "few" visitors defendant referred to would be BD members.

¶ 12    Fullilove testified that, the Monday after speaking with defendant, another BD named Willie Buckhana called him to ask why he failed to attend the meeting at defendant's residence. Later that morning, defendant also called Fullilove to tell him "[t]o be awake and that a few individuals were coming by." About 15 minutes after receiving defendant's call, Sherman Williams, Chris Smith, Kewhan Fields, Willie Buckhana, Willie McCoy, and Jeff Lindsey all arrived at Fullilove's apartment. Buckhana told Fullilove that the gang members would travel to Apartment 23 in order "to see if the [safe issue] could be squashed." Fullilove noted that Buckhana carried a handgun.

¶ 13    McCoy used the Schoolhouse Apartment's intercom system to verify that the inhabitants

of Apartment 23 were home before the gang members—except for Fullilove—left Apartment 12. Moments later, Fullilove reportedly heard "[a] couple of gunshots." He then moved to the back of his bedroom in Apartment 12 when he heard another burst of gunshots. At that point, McCoy called Fullilove to tell him to leave the apartment. Fullilove left with his pistol and was eventually arrested by responding police officers outside the building. Fullilove testified that after being arrested, he was interviewed three or four times. According to Fullilove, he gave police "several mixed up stories" about the day's events.

¶ 14    The State next called Eric Matthews to testify. Matthews first spoke of his previous convictions and specified that he was testifying in exchange for Kane County prosecutors' help in recalling an open warrant that had been issued for his arrest. He testified that he, along with Charles Keys and Quanson Carlisle, sold drugs out of Apartment 23 in August 1999 and that the three men kept drugs, guns, and ammunition in the safe that Fullilove stole from Apartment 28.

¶ 15    Matthews, a self-admitted member of the Gangster Disciples street gang, testified that he had just been released from Kane County Jail on the morning of Monday, August 16, 1999, before returning to the Schoolhouse Apartments. He, along with other inhabitants of Apartment 23, were celebrating Matthews' release from jail when defendant called the apartment. During the phone call, Matthews identified defendant as "chief" and spoke to him about the stolen safe. Defendant told Matthews that he was going to bring some guys to the apartment and that defendant would handle the dispute. At the time, Matthews thought that defendant meant to have all of the parties "talk it over about what happened with the safe or whatever" and "reimburse [him] or handle it in a way that everybody would be satisfied." Defendant told Matthews to "stay put." Matthews testified that later that afternoon, at approximately 12:15 p.m., Carlisle left Apartment 23 only to return a moment later. Once Carlisle reentered the apartment, the shooting began.

¶ 16    Quanson "Guda" Carlisle testified next and discussed his previous convictions. He admitted to having an interest in the safe that Fullilove stole. He said that after the safe had gone missing, he and Keys confronted Fullilove on two separate occasions about its whereabouts. After Fullilove denied taking the safe during the latter confrontation, Keys admitted that he tried to grab Fullilove and threatened to "beat him up and stuff." Fullilove ran off and told Carlisle and Keys that "he would be back."

¶ 17    Carlisle continued by testifying that he had known defendant for "[b]asically all of [his] life," and that he knew defendant to be a member of the BDs. He reported that on August 15, the Sunday before the shootings, defendant drove over to the Schoolhouse Apartments to ask him who had tried to punch or grab Fullilove. When Carlisle told defendant that Fullilove had stolen their safe, defendant told them that he didn't know about the dispute, but he would talk to Fullilove about the safe.

¶ 18    On the Monday of the shootings, Carlisle walked out of Apartment 23 and saw Sherman Williams, along with Smith, Fullilove, Fields, "Big Will" (who seems to have been Buckhana), and McCoy. Williams asked Carlisle, "What's up with you and [Fullilove]?" Carlisle responded that he had already discussed the matter with defendant, to which Williams replied, "I [*sic*] over here to holler at you for the chief, I'm here to holler for [defendant]." Carlisle testified that he responded to Williams with profanities before returning inside Apartment 23. At that point, he did not know where Cooper, who was previously with him in the apartment, was located. Upon reentering, Carlisle heard shots as the shooting began.

¶ 19    On redirect, when asked why Carlisle initially spoke to defendant about Fullilove stealing his safe, Carlisle responded, "Because he was like the head or whatever. He was takin' up for him I guess."

¶ 20    Charles Keys first testified about his previous convictions and pending criminal matters before discussing his interest in the stolen safe. Much of his testimony corroborated Carlisle's version of the events. For instance, Keys confirmed that he tried to "grab" Fullilove when Fullilove denied stealing the safe on the Sunday morning preceding the shootings. He also confirmed that defendant had driven by the Schoolhouse Apartments to question himself and Carlisle about the earlier confrontation with Fullilove.  Keys testified that defendant told the two that "[Fullilove] one of my guys. Ain't nobody going to mess with him." Keys also corroborated Carlisle's and Matthews' accounts of the actual shootings.

¶ 21    Sherman Williams testified about his previous convictions and his plea agreement with the State, which specified that, in exchange for his testimony, he would plead guilty to an aggravated-battery-with-a-firearm charge while the murder charges against him resulting from the shootings would be dismissed. Williams said that he had been a member of the BDs for [a]bout 18, 20 years," including the time of the shootings. He said that defendant was the leader of the BDs in Elgin, and that the BDs "call him chief plus the minister title." Williams also provided that he was "second in command. [Defendant's] right-hand man." He identified Buckhana as the BDs' "[c]hief security," before also identifying McCoy, Fields, Lindsey, and Smith as BD members. Williams testified that the BDs met at defendant's house every Sunday and that either defendant, himself, or Buckhana oversaw these meetings.

¶ 22    Williams said that he received a page from defendant's on Sunday, August 15, 1999, and that after calling him back, defendant told Williams to stop by his house. There, Williams saw Buckhana, Lindsey, and defendant. Defendant spoke of the safe that Fullilove stole from the inhabitants of Apartment 23 and described its contents, telling the BDs that "Fullilove, he came up with these guns and drugs and, you know, he's donating it, giving it to the organization, which

is the gang." Williams testified that he, Buckhana, and Lindsey each took one of the guns, and eventually left defendant's home.

¶ 23    Williams said that the next morning, the day of the shootings, he received another page from defendant's phone number. After initially ignoring it and subsequently receiving a second page from defendant, Williams called defendant back and was once again told to stop by defendant's house. Defendant asked Williams to bring the pistol that he had taken the previous day. Smith and Lindsey picked Williams up in a minivan. Lindsey told Williams that defendant also asked him to bring his gun to defendant's house.

¶ 24    Williams testified that once they arrived at defendant's house, he noticed that McCoy and another individual, Cedric Sanders, were already there. Moments later, Buckhana and Fields also "pulled up" to the house. The BDs gathered in defendant's garage, where defendant told the men that:

> "[H]e had got a call from some other guys relating that [Fullilove] had stole a safe, some
> guns, and some cocaine, weed, and they mad at [Fullilove]. They want to get at him, threats,
> and stuff like that. So basically [Fullilove] being in the same gang as us, it's like we
> shouldn't allow that. You know, we have to help him out."

At that point, defendant asked Williams and the others if they had their pistols. Once they confirmed as much, defendant said, "Y'all got your pistols, you know what I'm sayin', you know, I want y'all to go over there and y'all holler at business." When asked what he thought defendant had meant by this, Williams replied, "[S]hoot, everybody loaded up with guns, somebody was going to get killed." Williams testified that as the BDs were leaving the garage, he witnessed defendant hand Fields a pistol.

¶ 25    Following the meeting, Smith drove Williams and some of the other BDs to the

Schoolhouse Apartments. Once everyone arrived, the men went to Fullilove's apartment, where Fullilove confirmed that the men in Apartment 23 were hassling him about the stolen safe. Buckhana then told the men that "if them mother-fuckers upstairs get out of hand, let's kill those mother-fuckers."

¶ 26    Williams confirmed Fullilove's testimony that McCoy then went to the Schoolhouse Apartment's intercom system to verify that the inhabitants of Apartment 23 were home. The BDs then left for Apartment 23, with McCoy, Williams, Buckhana, Smith, and Fields leading the way. Williams did not know where Fullilove was at this time. However, upon reaching the landing outside of Apartment 23, Williams saw Carlisle and Cooper standing outside. Williams corroborated Carlisle's earlier testimony of their conversation that took place outside of Apartment 23, whereby Williams told Carlisle that they were there on defendant's orders. Williams also noted that Carlisle directed some expletives at the BDs before turning around and reentering Apartment 23.

¶ 27    Williams testified that he heard the first shot as Carlisle was reentering the apartment. He noticed that Fields had his pistol raised before Buckhana fired a second shot at Cooper, who then "hit the floor." Williams, Lindsey, and Buckhana then entered the apartment while some of its inhabitants were escaping through the window. Buckhana shot at another inhabitant, who fell, before Williams also began shooting. When asked what Williams intended to do at that time, he responded, "Kill." Buckhana saw two inhabitants get shot in the head and "hit the floor." He saw a third man get shot and fall before the BDs all "took off running."

¶ 28    Williams testified that after returning to Smith's van, which was still waiting outside, he called defendant and told him that "nation business been taken care of," to which defendant replied, "I heard." Williams further provided that defendant had asked him to call after leaving the

Schoolhouse Apartments. Williams testified that after he was eventually arrested, he did not originally tell the police about the events leading up to and through the shootings.

¶ 29 On cross-examination, defense counsel asked Williams, "Taking care of business can mean a number of things; is that correct?" Williams replied, "If you suited up with six to eight guys, you all got pistols, take care of your business means, shit, somebody [fixing] to get hurt."

¶ 30 Holly Lucy, who was living with Lindsey during August 1999, testified that, on the Sunday preceding the shootings, Lindsey received a phone call from defendant, prompting her and Lindsey to go to defendant's house. Once there, Lucy sat with Smith, Williams, Williams' girlfriend, defendant, Lindsey, and Buckhana. Lucy noticed that that Defendant, Lindsey, and Buckhana passed around a gun. Lucy and Lindsey left defendant's house late at night, and the next morning, Lindsey received a phone call before telling Lucy "he had to go." Lucy saw Lindsey tuck a gun in his waistband before telling her "he was dropping it back off at [defendant's]." On redirect, Lucy specified that she had never seen Lindsey with the gun before around the house.

¶ 31 The State also presented testimony from several different phone-company employees that was consistent with earlier testimony regarding the various phone calls made before and after the shootings. Additionally, Detective Brian Gorcowski testified about Williams' arrest and interrogations, that both took place on September 5, 1999. Gorcowski confirmed that, during those interrogations, Williams described the meetings that took place at defendant's house leading up to the shootings, the dispute with the safe, and the shootings themselves. However, Gorcowski noted that Williams initially denied shooting at anyone on August 16. Gorcowski also testified that Williams did not enter into a plea agreement with the State until August 2002, which was nearly three years after his interrogation.

¶ 32 Officer Sean Rafferty, who had worked with the Elgin police department's gang unit for

seven and a half years, was accepted as an expert in street gangs. He discussed the leadership structure of Elgin's BDs and named defendant as the BDs' leader, a position entitled "[c]hief or minister." He also verified that Williams was the Elgin BDs' "co-minister." Upon being shown one of defendant's sweatshirts that had previously been admitted into evidence, Rafferty noted the words "Big Chief" emblazoned on the front of the sweatshirt, as well as several BD gang symbols along the sweatshirt's back and sides. Rafferty also identified several photographs that were taken from defendant's residence—including one taken with defendant's fiancée, Joanne Bobo—in which defendant made BD hand signals. Rafferty said that he had previously identified a tattoo of a six-pointed star on defendant's chest, which also carried gang connotations. On cross-examination, Rafferty clarified that the six-pointed star carried meaning for several different gangs under the Folk nation and that the symbol could also hold religious meaning.

¶ 33    The defense called Kathy Byrne to testify, who said that she lived next door to defendant and Joanne Bobo. Joanne was Kathy's sister-in-law. Kathy claimed that on August 16, 1999, she was outside on her porch from 6:30 a.m. until about 5:00 p.m., only returning inside for 15 minutes or so to "fix some lunch." Kathy denied seeing Buckhana, McCoy, Lindsey, Smith, or Williams visit defendant's house before 12:30 p.m. She also testified that she had not seen or heard the men visit defendant's house the previous Sunday, either. On cross-examination, Kathy added that she had not seen defendant make any phone calls on the day of the shooting. On recross, she admitted that she had not attempted to exonerate defendant by telling investigators about her observations on August 15 or 16.

¶ 34    Joanne Bobo, defendant's fiancée, testified that she had lived with defendant for five years prior to the shootings. She said that, on the day of the shootings, she woke up at 6:30 a.m. to take her son and nephew to football practice before taking her car to a mechanic at 7 a.m. Joanne

claimed that, after her brother brought her home around 7:45 a.m., she did not see Williams, McCoy, Smith, Lindsey, or Buckhana that morning. Joanne testified that, the Sunday before the shootings, she had worked from 8 a.m. to 5 p.m. but denied seeing the men on that evening as well.

¶ 35    On cross-examination, the State asked Joanne, "[D]id you ever go to the police and tell them that your fiancé was in jail and you were with him all day and he didn't do anything?" After the court overruled the defense's objection, Joanne answered, "It wouldn't have made a difference." The State also questioned Joanne about whether defendant was in a gang. After Joanne denied as much, the State asked her, "Do you know whether your fiancé had a six-pointed star on his chest?" Joanne replied, "I didn't pay no attention, no." When asked whether she had ever seen defendant use gang signs, Joanne answered, "No, I don't even know what gang signs are." The State showed her the photograph of defendant making BD gang signs while posed alongside of her, but Joanne claimed that she did not pay attention to defendant's fingers in the photograph.

¶ 36    Theodius Bobo, Byrne's husband and Joanne's brother, testified that he took Joanne to have her car serviced on the morning of the shootings. He returned home around 7:20 a.m. and remained outside until around 12:30 p.m. He asserted that he did not see Williams, McCoy, Smith, Lindsey, Fields, or Buckhana between those times. Theodius testified that, on the day before the shootings, he was not at home between 6:00 a.m. and 11:30 a.m.. When he returned at 11:30 a.m., he did not see the Williams, McCoy, Smith, Lindsey, or Buckhana at defendant's residence.

¶ 37    Although the trial court had previously ruled that the defense would not be able to admit the testimony of Frederick Neal, the defense made an offer of proof, based on statements that Neal made to investigators in April 2000. According to the proffer, while Neal was held in the McHenry County Jail, he spoke with Buckhana, who told Neal that he had been in charge of the shootings and that defendant did not have anything to do with the shootings. According to Neal, Buckhana

also told him that defendant would be a good scapegoat for the crimes, as he was already being monitored by the Elgin police.

¶ 38    In response to the defense's offer of proof, the State pointed out that Buckahana had allegedly made these statements approximately seven months after the shootings. Furthermore, the alleged statements contradicted two taped statements that Buckhana made a few days after the shootings, in which he conceded that there was a meeting at defendant's house where defendant handed out guns to individuals before telling them to "squash" the safe dispute and to make sure everyone was dead. The State also pointed out that Neal had also told police that defendant was present at a meeting preceding the shootings, "but just wanted everyone to get beat up with baseball bats."

¶ 39    The jury convicted defendant of all charges. Defendant waived a jury for sentencing and the trial court found that he was eligible for the death penalty. However, instead of imposing the death penalty onto defendant, the court sentenced him to a mandatory term of life imprisonment for the murder convictions (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998)) and 20-year concurrent terms for the other convictions. We affirmed the trial court's judgment on direct appeal. *People v. Binion*, No. 2-03-0453 (2005) (unpublished order under Illinois Supreme Court Rule 23).

¶ 40                              C. Postconviction Proceedings

¶ 41    Defendant has brought several collateral attacks against his convictions, beginning with his first, February 2006, *pro se* postconviction petition. The trial court dismissed the first petition, citing an absence of supporting affidavits or exhibits, and we affirmed. *People v. Binion*, No. 02-06-0452 (2008) (unpublished order under Illinois Supreme Court Rule 23). On two separate occasions, defendant moved for leave to file successive postconviction petitions, but the trial court denied each motion in turn only to be affirmed by this Court. *People v. Binion*, No. 2-09-0206

(2010) (unpublished order under Illinois Supreme Court Rule 23) (first successive petition); *People v. Binion,* 2012 IL App (2d) 100903-U (second successive petition). The trial court denied defendant's motions for leave to file his third successive postconviction petition, resulting in the appointment of appellate postconviction counsel. Counsel moved to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551(1987) and *People v. Lee*, 251 Ill. App. 3d 63 (1993). We granted the motion to withdraw and once again affirmed. *People v. Binion*, 2014, IL App (2d) 131089-U, ¶ 8.

¶ 42    On November 28, 2016, defendant moved for leave to file his fourth successive postconviction petition. In the motion, defendant alleged actual innocence, while arguing that the prosecutors engaged in misconduct in securing his conviction.[1] In support of his claims, defendant attached three affidavits to his proposed petition that were prepared by Darryl Housley, Michael King, and Tyrone Mabrey.

¶ 43    Housley averred that, in December 2014, he spoke with Buckhana. Housley recounted that Buckhana told him that Fullilove personally called the shooters and supplied them with guns. According to Housley, Buckhana said that Williams had made the call to kill the victims and that defendant was merely a scapegoat. King and Mabrey attested that, on the day of the shootings, they were present at the Schoolhouse Apartments where they personally heard Williams order the BDs to kill the inhabitants of Apartment 23.

¶ 44    Defendant also included a transcript from one of Fullilove's interrogations to support his actual innocence claims, which defendant asserts were withheld from him before his trial. In that transcript, Fullilove never mentions any meetings that defendant held leading up to the shootings.

---

[1] Defendant also argued that the judgment against him was void due to erroneous jury instructions, but defendant did not make this argument upon appeal.

Instead, Fullilove indicates that he called the shooters over to his apartment on August 16, 1999.

¶ 45    On February 22, 2017, the trial court first denied defendant leave before reiterating its denial through a corrected ruling filed on March 2, 2017. Defendant timely appeals.

¶ 46                                    II. ANALYSIS

¶ 47    At issue in this appeal is whether the trial court erred in denying defendant leave to file his fourth successive postconviction petition. Defendant argues that he was entitled to file his successive petition for several reasons. First, defendant contends that he established cause and prejudice as a result of an exhaustive list of perceived deficiencies in the proceedings concerning his initial postconviction petition. Second, Defendant similarly claims that he has established cause and prejudice and with regards to his *Brady* violation claim. Third, defendant argues that he established a free-standing claim of actual innocence, based on the recently discovered affidavits and Fullilove's interrogation transcript. Alternatively, defendant argues that he has shown cause and prejudice for failing to introduce these documents at an earlier proceeding. For the following reasons, we find that all of defendant's arguments miss their mark.

¶ 48    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 *et seq*. (West 2016)) provides criminal defendants with a procedural mechanism to argue that their convictions resulted from a substantial constitutional deprivation. 725 ILCS 5/122-1(a)(1) (West 2016). "A post-conviction proceeding is a collateral attack upon a prior conviction or sentence and does not relitigate a defendant's innocence or guilt." *People v. Harris*, 206 Ill. 2d 293, 299 (2002) (citing *People v. Evans*, 186 Ill.2d 83, 89 (1999)). Generally, criminal defendants are entitled to file only one postconviction petition under the Act, which specifies that any claims not raised in an original or amended petition are waived. 725 ILCS 5/122-3 (West 2016); *People v. Holman*, 191 Ill. 2d 204, 210 (2000). However, a criminal defendant may file a successive petition upon showing "cause

for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice [that] results from that failure." 725 ILCS 5/122-1(f) (West 2016). Additionally, our supreme court has found that a criminal defendant may also file a successive postconviction petition if necessary to prevent a fundamental miscarriage of justice. *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). "To demonstrate such a miscarriage of justice, a petitioner must show actual innocence or, in the context of the death penalty, he must show that but for the claimed constitutional error he would not have been found eligible for the death penalty." *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). We review *de novo* the denial of a motion for leave to file a successive post-conviction petition under the Act. *People v. LaPointe*, 365 Ill. App. 3d 914, 923 (2006), *aff'd*, 227 Ill. 2d 39 (2007).

¶ 49                    A. Defendant's First Postconviction Petition Proceedings

¶ 50    Defendant spends the bulk of his opening brief arguing that he has established cause and prejudice because the proceedings surrounding his first postconviction petition were "fundamentally deficient and a virtual nullity." However, this argument has been forfeited because defendant improperly raises this claim for the first time on appeal. *People v. Haywood*, 407 Ill. App. 3d 540, 551 (2011) (finding that a party generally forfeits its right to raise an issue on appeal that was never heard by the trial court); *People v. Merriweather*, 2017 IL App (4th) 150407, ¶ 14 (finding a criminal defendant may not raise arguments to the appellate court that were not initially heard by the trial court when seeking leave to file a successive postconviction petition).

¶ 51    *Arguendo*, even if defendant did not forfeit this argument, we note that defendant's argument is flawed because it relies on decades-old case law that has subsequently been distinguished by our supreme court. Defendant predominately relies on *People v. Free*, 122 Ill. 2d 367 (1988), in arguing that his list of perceived errors surrounding the first petition automatically

establishes cause and prejudice for his fifth—and totally unrelated—postconviction petition. In *Free*, our supreme court reasoned:

> "To be sure, section 122-3 is not an ironclad bar on multiple post-conviction petitions, but in those cases in which the court has allowed the filing of successive post-conviction petitions, the proceedings on the original petitions were deficient in some fundamental way." *People v. Free*, 122 Ill. 2d 367, 376 (1988).

There, after noting that the petitioner already had "one complete opportunity" to show a substantial deprivation of constitutional rights in a previous postconviction petition, the court consequently affirmed the trial court's denial of leave for the defendant to file a successive petition under the Act. *Id.* at 376-377.

¶ 52 Now, relying on *Free*, defendant seems to take the misguided view that, in order to establish cause and prejudice for the claims in his current petition, he only need establish that the proceedings surrounding his first petition were "virtual nullities."[2] We disagree.

¶ 53 In *Pitsonbarger*, which defendant cites throughout his briefs, our supreme court sought to clarify the language it used in previous decisions concerning successive postconviction petitions. *Pitsonbarger*, 205 Ill. 2d at 459-63. Specifically, when determining whether the petitioner's alleged deprivation of "one complete opportunity" to present his first petition entailed automatic consideration of a successive postconviction petition, the court stated:

---

[2] This conclusion is reinforced by defendant's repeated assertions that "because [defendant] has not had one full opportunity to raise his substantial constitutional claims, he has established cause and prejudice."

"Petitioner claims that dismissal of his first post-conviction appeal as a result of counsel's failure to file a brief denied him 'one complete opportunity,' so that all issues raised in his second petition should be considered. Nevertheless, because section 122–3 applies to claims and not to petitions, *we hold that a petitioner must establish cause and prejudice as to each individual claim asserted in a successive petition, even if he demonstrates that his initial post-conviction proceeding was deficient in some fundamental way. That is, he must show how the deficiency in the first proceeding affected his ability to raise each specific claim.*" *Id.* at 463 (emphasis added).

¶ 54    Despite this clear language in a case that was repeatedly cited throughout his briefs, defendant draws no nexus whatsoever between the alleged deficiencies surrounding the first petition and the distinct, individual claims made in his instant petition. Waiver notwithstanding, defendant's argument still necessarily fails because defendant has not shown—nor even attempted to show—how the alleged deficiencies in the first proceeding affected his ability to raise the claims in his instant petition.[3]

---

[3] Furthermore, while the following acknowledgment does not affect our holding, we note that many of defendant's alleged deficiencies seem dubious, at best. For instance, defendant provides little to no explanation as to why he failed to raise any of his claims concerning the trial court's adjudication on appeal, aside from offering us the unsubstantiated conclusion that his appellate counsel was ineffective. Furthermore, defendant argues that our review of his initial petition was also deficient, despite admitting that the record does not contain his initial brief that formed the basis of our review. It is unclear how defendant can therefore take issue with our analysis of his initial petition when he is oblivious to the arguments that we reviewed.

¶ 55                    B. Defendant's *Brady* Violation Claim

¶ 56    Second, defendant has not successfully established cause and prejudice with regards to his *Brady* violation claim. As indicated earlier, the Act establishes that leave of court to file a successive postconviction petition may be granted where "a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2016). The Act goes on to describe exactly how a petitioner may establish cause and prejudice:

> "(1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 57    In turning to this second argument, we note that defendant once again improperly brings an argument before us that was never presented to the trial court. In his motion for leave, defendant argued that he does not need to show cause and prejudice with regards to the *Brady* claim, reasoning that "there are exceptions to the cause and prejudice tests, such as *** [p]rosecutorial misconduct[;] failure to turn over a transcript showing another responsible." Therefore, because defendant did not previously argue that cause and prejudice existed with regards to the *Brady* claim, his argument is forfeited and should not be considered. *Haywood*, 407 Ill. App. 3d at 551; *Merriweather*, 2017 IL App (4th) at ¶ 14.

¶ 58    Still, even if this argument were properly preserved, it nonetheless lacks merit. According to defendant, he has established cause with regards to the Fullilove transcript "because he had 'no knowledge' about the Fullilove interview until recently." Defendant claims that he has likewise

established prejudice, because "the interview directly went to a key part of the State's accountability theory." However, we find that defendant is unable to establish cause or prejudice for his failure to previously bring this claim under the Act.

¶ 59    Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the State "must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.'" *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady,* 373 U.S. at 87).

> "A Brady claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully [*sic*] or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

"Materiality is demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *People v. Coleman*, 183 Ill. 2d 366, 393 (1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).

¶ 60    Here, the allegedly withheld interrogation transcript was not material because, even if it were presented to the defense prior to trial, it is unreasonable to assume that the outcome of the trial would have been any different. During his direct examination, Fullilove admitted to telling the police "several mixed up stories" after his arrest, meaning the defense and the jury were already aware that Fullilove's testimony contradicted statements he made while in custody. For this reason, the interrogation transcript would not aid the defense by impeaching Fullilove—it would only corroborate and bolster Fullilove's trial testimony.

¶ 61    Furthermore, it is unreasonable to assume that a jury would believe that the version of events as outlined in the transcript were true. The transcript contradicts the testimonies of

Fullilove, Matthews (who testified about defendant's assurances that he'd bring his men to Apartment 23 on the day of the shooting), Carlisle (who mentioned defendant's active role in the safe dispute as well as Williams' claim that the shooters were acting on defendant's orders), Keys (who similarly discussed defendant's interest in the safe), Williams (who detailed the meetings in which defendant discussed the safe dispute before arming the shooters), Lucy (who confirmed that Lindsey traveled to defendant's house on the days the meetings took place), and the various phone company employees (who corroborated the testimony concerning the phone calls made before and after the shootings). Aside from these contradictions, it is difficult to imagine how Fullilove—who was 15 at the time of the shootings—would have the authority to compel Williams and Buckhana—who both held leadership positions within the BDs—to take part in the shootings.

¶ 62    Because defendant is unable to show that the allegedly withheld evidence was material, he is unable to show that a *Brady* violation took place. Consequently, he cannot claim that he was prejudiced by a *Brady* violation that, as a matter of law, never occurred. For these reasons, defendant has failed to show cause and prejudice with regards to his *Brady* claim.

¶ 63                    C. Defendant's Actual Innocence Claims

¶ 64    Third, we find that the trial court properly denied defendant's motion for leave because defendant has failed to set forth a colorable, freestanding claim of actual innocence. "The elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial." *People v. Edwards*, 2012 IL 111711, ¶ 32 (citing *Ortiz*, 235 Ill.2d at 333).

¶ 65    Evidence is "newly discovered" if it was unavailable at trial and was undiscoverable at a sooner date through due diligence. *Harris*, 206 Ill. 2d at 301. Evidence is not "newly discovered"

if it presents facts that the defendant was already aware of before trial, even if the source of those facts were unknown, unavailable, or uncooperative. *People v. Davis*, 382 Ill. App. 3d 701, 712 (2008). Furthermore, in order for the evidence supporting an actual innocence claim to be considered conclusive, it must place "the trial evidence in a different light and [undermine] the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 56.

¶ 66    With these principles in mind, we turn to the evidence that defendant relies on in bringing his actual innocence claim.

¶ 67                              1. The Housley Affidavit

¶ 68    Defendant argues that the Housley affidavit is "new because [defendant] attested that he recently learned of the information and the evidence itself[,] coupled with the record[,] established that it was newly discovered. [Defendant] stated that he recently learned of these additional witnesses when they spoke with his mother 10 years after trial and where one of them moved out of state." Defendant further provides, "While Housley's affidavit does not indicate when he told Mr. Binion about the evidence he possessed, it does state that Housley learned about the exculpatory evidence on December 5, 2014, when he spoke with Buckhana." We disagree with defendant's assertions that the Housley affidavit is "newly discovered."

¶ 69    As defendant concedes in his opening brief, the evidence presented by the Housley affidavit mirrors Frederick Neal's statements that were identified in the defense's offer of proof. Both Neal and Housley alleged that defendant was a scapegoat in the shootings, that Buckhana was coerced into implicating defendant, and that defendant bore no responsibility for the shootings.

Therefore, because the defense already had evidence of these supposed facts before trial, Housley's affidavit cannot be considered "newly discovered" under *Davis*. *Id.*[4]

¶ 70    Furthermore, even if the Housley affidavit were "newly discovered," it is not conclusive because its existence would not undermine the court's confidence in defendant's guilt. To this point, defendant argues that the Housley affidavit was conclusive because it "would have corroborated Neal's proposed testimony and it would rebut any assertion that Neal's testimony was unreliable." Defendant also contends that Housley's affidavit would have discredited the phone records as well as any presumption that defendant held any meetings to orchestrate the shootings.

¶ 71    Defendant's arguments are misguided. First, even if the evidence presented by the Housley affidavit was presented to the trial court, it would not corroborate Neal's testimony because the court already ruled that Neal's testimony was inadmissible. Still, even if both affidavits were admissible, the evidence presented by Neal's and Housley's hypothetical testimony would undoubtedly carry little weight. As the State mentioned at trial, Buckhana told police—days after the shooting—that defendant held meetings at his house, where he handed out guns to four different shooters. Because Buckhana apparently changed his story in the years that elapsed before speaking with Neal and Housley, their proposed testimony would solely consist of recantation evidence, which is inherently unreliable. *People v. Morgan*, 212 Ill.2d 148, 155 (2004).

---

[4] While there does seem to be an exception to the rule outlined in *Davis* with regards to witness recantation (*People v. Barnslater*, 373 Ill. App. 3d 512, 524 (2007)), Buckhana was never called as a witness.

¶ 72    Furthermore, while defendant claims any evidence of defendant's phone calls or meetings would be discredited by Housley's testimony, we find the opposite to be true. The phone records— coupled with the testimony of Fullilove, Williams, and Lucy—would certainly discredit the weak recantation evidence presented in Housley's hypothetical testimony.[5] Therefore, because the evidence presented within the Housley affidavit is neither "newly discovered" nor conclusive, the affidavit does not support an actual innocence claim.

¶ 73                    2. The Mabrey and King Affidavits

¶ 74    Next, neither the Mabrey nor the King affidavits are sufficient to support an actual-innocence claim because they also lack conclusiveness. To this point, defendant argues that the affidavits are material because "the potential testimony of King and Mabrey would add to the defense theory that the murders were acts committed based on orders given by Williams or Buckhana and not [defendant]." On the other hand, the State argues that neither affidavit is conclusive because they do not contradict the State's theory of accountability. We agree with the State.

---

[5] Defendant argues, alternatively, that he has established cause and prejudice with regards to the new evidence he has presented through the affidavits and transcript of Housley, Mabrey, King, and Fullilove. However, this claim is nonsensical; the cause and prejudice test applies to claims of constitutional deprivations, not to evidence. 725 ILCS 5/122-1(f) (West 2016). Furthermore, these alternative arguments have been forfeited because, once again, they were never presented to the trial court. *Haywood*, 407 Ill. App. 3d at 551; *Merriweather*, 2017 IL App (4th) at ¶ 14. For these reasons, we will not consider any of defendant's alternative cause and prejudice arguments with regards to any of the purportedly "new" evidence he cites in his briefs.

¶ 75    As we noted on direct appeal, the trial court gave the jury the following instructions pertaining to accountability:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in planning or commission of an offense." *Binion*, No. 2-03-0453 at 19 (quoting Illinois Pattern Jury Instruction, Criminal, No. 5.03 (4th ed. 2000).

> "To sustain the charge of first degree murder \*\*\*, the State must prove the following propositions:

> First proposition:    That the defendant or one for whose conduct he is legally responsible performed the acts which caused the death \*\*\* and

> Second proposition:   That when the defendant or one for whose conduct he is legally responsible did so, he knew that his acts created a strong probability of death or great bodily harm \*\*\*." *Id.*

¶ 76    In clarifying these instructions to the jury, the trial court also provided a supplemental instruction, based on *People v. Terry*, 99 Ill. 2d 508, 514 (1984), in explaining the State's accountability theory:

> "Where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts." *Binion*, No. 2-03-0453 at 20.

We found that these jury instructions all accurately stated the law. *Id.* at 22-23; *People v. McCoy*, 337 Ill. App. 3d 518, 522 (2003).

¶ 77    With these principles in mind, it is clear that both the Mabrey and King affidavits bear no weight regarding defendant's accountability for the murders. Even if the events outlined in the affidavits were true and Williams gave the final go-ahead for the killings, defendant would still be legally responsible for Williams' actions based on the overwhelming evidence the State produced at trial. Otherwise put, the affidavits do not conflict with any of the State's evidence of defendant's involvement in orchestrating the shootings, such as the testimony establishing his interest in the safe dispute, the evidence concerning the meetings that took place at defendant's house, the evidence establishing defendant's leadership of the BDs, or the phone records that corroborated most of the State's theory. Because the affidavits would consequently fail to place the trial evidence in a different light, they cannot support a claim of actual innocence.

¶ 78                                            3. The Fullilove Transcript

¶ 79    Finally, defendant's proffered transcript of the Fullilove interrogation do not give rise to a freestanding actual innocence claim. Turning to this final argument, we first note that defendant's reliance in the Fullilove transcript to support both his *Brady* claim and his actual innocence claim violates our supreme court's holding in *People v. Hobley*, 182 Ill. 2d 404, 444 (1998) (finding that evidence cannot support both a freestanding claim of actual innocence as well as a claim of another constitutional deprivation). See also *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 30 (holding defendant could not simultaneously offer same evidence in support of a *Brady*-violation claim and an actual innocence claim). However, even if we overlook this error, defendant's argument nonetheless flounders on its own merits.

¶ 80    As we mentioned when previously analyzing defendant's *Brady* claims, the Fullilove transcripts are consistent with Fullilove's trial testimony, in which he admitted to giving police several "mixed up stories" pertaining to the shooting. Therefore, taking into account the mountain

of other evidence corroborating Fullilove's trial testimony, it would be unreasonable to conclude that a jury would believe that the version of events as outlined in the transcript were anything but a "mixed up story." Consequently, just as the transcripts were not material for purposes of a *Brady* analysis, they are not conclusive for purposes of defendant's actual innocence claim.

¶ 81                                   III. CONCLUSION

¶ 82    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 83    Affirmed.